IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JERRY LYNN STEWART,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-721-PJC |
| | ) | |
| **MICHAEL J. ASTRUE,** Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Claimant, Jerry Lynn Stewart ("Stewart"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Stewart's application for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Stewart appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Stewart was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**

At the time of the hearing before the ALJ on November 20, 2007, Stewart was 53 years old. (R. 22). He completed eleventh grade. (R. 23).

Stewart testified that the last time he worked was May 19, 2004, at the Baker Hughes chemical plant in Sand Springs. *Id.* He had been working in shipping and receiving when he

hurt himself. (R. 23-24). He was on medical leave for six months and was terminated when he was unable to return to work. (R. 24).

Stewart testified that he was diagnosed with degenerative disk disease, which first came to light when he was injured. (R 24-26). He was primarily treated for pain by Dr. Revelis, but had not seen him since 2005 due to lack of insurance and inability to afford treatment. (R. 26-27). He was treated by Dr. Revelis with two epidural steroid injections. (R. 27).

Stewart also had been evaluated as having hearing loss, and he testified that he was in the process of getting hearing aids. (R. 28). He sometimes had arm and elbow pain, and he testified that it was not the reason why he could not work. (R. 29). Stewart testified that he also had high blood sugar that was monitored by his family doctor, Dr. McClintock, but he did not take insulin. (R. 29-30).

The pain from his back affected his ability to work, and he testified that he was in pain all the time. (R. 30). He had taken prescription pain medication which did not help, and at the time of the hearing, he took Tylenol and over-the-counter pain medications. *Id.* Those helped, if he lay down and put his arms over his head to relieve the pressure. (R. 31).

On a typical day, he woke at 6:00 a.m. and made sure everybody else in the house got up. *Id.* He watched television and sometimes did laundry, but no heavy activities. *Id.* He could do grocery shopping, but he couldn't do activities that involved bending or lifting due to pain that would continue for two or three days. *Id.* He did not do dishes or sweep. (R. 31-32). On a typical day, he would fix himself a sandwich for lunch, but his wife would prepare the evening meal. (R. 32). His son did the yard work. (R. 33). He testified that he did not belong to social groups. *Id.* His appetite was good, and the quality of his sleep depended on how much activity he had gotten that day, but he normally slept seven to eight hours. (R. 33). He napped during the

day. (R. 34).

Stewart testified that he could only sit, stand, or walk at one time for about 15-20 minutes. *Id.* In an eight-hour day, he could sit, stand, and walk for a total of about two hours each, with breaks. *Id.* The most he could pick up was a gallon of milk. (R. 35). From a standing position, he could touch his knees, but it would bother him, and he could not touch his toes. *Id.* He could squat and get back up, but it would bother him. *Id.* He could not pick up items from the floor. *Id.* Because he could not put his arms in front of him comfortably, Stewart testified that he could not push, pull, or operate levers from a seated position. (R. 36). He could pick up small items from the table for a while, and he could drive a car. *Id.* He could reach and extend his arms to his side, in front of him, and overhead. *Id.* He thought his grip with both hands would be 2 on a scale of 1 to 5. *Id.*

Stewart was seen in the office of Lynn McClintock, M.D. on August 29, 2003, with a complaint of left hip pain that radiated down the buttocks, which Stewart described as having been present for two weeks and not resulting from an injury. (R. 238). Upon examination, there was pain on external rotation with limited range of motion. (R. 239). A steroid shot was given into the joint, and Stewart was prescribed Skelaxin. *Id.* X-rays were normal. (R. 267-68). At a recheck on September 4, 2003, Stewart said that he was not any better. (R. 237-38). X-rays of Stewart's lumbar spine showed some disc space narrowing at T12-L1 "with wedging marginal osteophytes." (R. 267). At the S1 level, the radiologist noted "pseudoarthrosis" "exhibiting significant hypertrophic change," but he also noted that "no acute findings are demonstrated." *Id.* Dr. McClintock's records reflect that Stewart was referred to a specialist. (R. 235-37). Through November 2003, it appears that Stewart had chiropractic treatments. (R. 230-35). An MRI scan of the lumbar spine on December 1, 2003 showed a "[p]seudoarticulation of L5 or S1 on the left,

3

a developmental anomaly. No active pathology is detected." (R. 166).

On March 19, 2004, Stewart was seen in Dr. McClintock's office with a chief complaint of stomach pressure with occasional pain. (R. 227-28). The notes state that there was "epigastric tenderness in abdominal wall muscle," and the assessment was muscle wall pain. (R. 228). Stewart was given Vioxx samples. *Id.*

On May 20, 2004, the pain was described as upper abdominal pain. (R. 225). Dr. McClintock described "very tender epigastrium" and right upper quadrant, and assessed it as epigastric abdominal pain. (R. 226). Dr. McClintock questioned if there was an ulcer or gall bladder disease, prescribed Nexium, and referred Stewart for an MRI. *Id.* Abdominal x-rays on that same date showed "marked hypertrophic changes are present at the pseudoarthrosis between L5 and the ala of the sacrum on the left side." (R. 267). Impressions from a sonogram on May 24, 2004 were left renal calculus and fatty liver, with all other visualized organs appearing normal. (R. 207, 266). CT scan of the abdomen on June 2, 2004, did not show the renal calculus described on the May 24, 2004 sonogram, and no significant abnormalities were seen. (R. 175 266).

Dr. McClintock's records indicate a referral on June 3, 2004 to a gastroenterologist for assessment and colonoscopy if indicated. (R. 222). At an office visit on June 16, 2004 to discuss the referral, Stewart stated that he felt "a lot better," and that the epigastric symptom was not a pain but a pressure when he leaned forward. (R. 220). The notes also state that Stewart had been off work since the May 20 visit[1] due to pain with lifting and most activities. (R. 221). The assessment was unspecified abdominal pain, with notes to question whether it was pain due to

---

[1] The notes stated "5/20/03," but it appears clear that this was intended to refer to the May 20, 2004 office visit. (R. 221, 225-26).

4

hiatal hernia, gallbladder, or muscle strain. *Id.*

On July 6, 2004, Dr. McClintock signed a CNA form entitled "Medical Assessment Tool." (R. 163). She stated Stewart's primary diagnosis as abdominal pain, and said that Stewart could not sit longer than 15 minutes every 2 hours, stating that those restrictions were in effect from May 19, 2004 to the present. *Id.* She listed the diagnostic testing that had been done in the time frame of May to July 2004. *Id.*

Stewart saw Dr. McClintock again on July 7, 2004, and he stated that he did not have much pain but had a lot of abdominal pressure. (R. 218). It was described as constant pressure in the location of the lower middle ribs that was worse if he sat up or leaned over. *Id.* Examination showed that Stewart was "very tender along ribs medially costal chondral area." (R. 219). The assessment was again unspecified abdominal pain, with a question of whether it could be costachondritis and doubting that it was a hernia. *Id.* The plan included a referral to a pain specialist for evaluation. *Id.*

Stewart saw Andrew F. Revelis, M.D., a pain specialist, on July 20, 2004. (R. 154-56). Stewart's chief complaint was mid epigastric pain, and he described the pain as having been a result of a twelve-foot fall from a ladder in March, 2004. (R. 154). The pain was described as constant, aching, and cramping in nature, and 7 on a scale of 1-10. *Id.* Stewart described the pain as worse with activities such as sitting, lifting, sneezing, coughing, and using his arms, and better with rest and medication. *Id.* Dr. Revelis' report stated that Stewart continued to work full time. *Id.* Examination showed full range of movement of Stewart's cervical and lumbar spine, with full strength in both legs and arms. (R. 155). Dr. Revelis' impressions were mid epigastric pain, with a need to rule out thoracic degenerative changes. *Id.*

An MRI of the thoracic spine on July 23, 2004, showed "[m]inor, chronic appearing and

5

plate compression, T8," and "minor multilevel degenerative changes." (R. 153, 197).

On August 5, 2004, Stewart saw Dr. McClintock again, and the pain was described as an 8 out of 10. (R. 216). It was described as located in the epigastrium and rib cage and caused by any activity, straining, bending, or lifting. *Id.* On examination, Stewart was tender in the area of the epigastrium and base of xiphoid. (R. 217). The notes state that while Stewart was waiting to see the pain specialist, Dr. Revelis, again, he could not "work due to worsening of [symptoms] with activity, pain is severe." *Id.*

On August 12, 2004, internal communications of Dr. McClintock's practice state that Stewart needed a letter explaining why he could not work, including the supporting medical reasons. (R. 216).

On August 24, 2004, Stewart saw Dr. Revelis for a follow-up examination. (R. 151). Dr. Revelis described the July 23, 2004 MRI of Stewart's thoracic spine as "consistent with a thoracic compression fracture at T8 which correlates to the dermatome for his mid epigastric region." *Id.* His plan was to treat Stewart with "an intralaminar epidural injection at T8-9." *Id.*

On August 30, 2004, an upper abdominal sonogram was normal. (R. 168).

Stewart had an epidural steroid injection performed by Dr. Revelis on September 13, 2004. (R. 191-92). At the time of this procedure, Dr. Revelis described the diagnoses as thoracic compression fracture and thoracic degenerative disc disease. (R. 191).

On November 26, 2004, internal communications of Dr. McClintock's practice state that Stewart needed an extension of his short-term disability, and that the doctor's response was that Stewart needed "to either get another shot or go to work." (R. 211). On December 5, 2004, additional communications state that Stewart needed a letter dated back to October 4. *Id.* More internal communications on January 3, 2005 reflect that Dr. McClintock was told that Dr.

Revelis had released Stewart to return to work and that Dr. McClintock was in agreement with that release. (R. 210).

Stewart was seen in Dr. McClintock's office on January 12, 2005, and at that time Stewart said that he was not on any medications and was no better and no worse. (R. 208). He described the pain as a cramping pain in the mid epigastrium when he had to bend over. *Id.* The assessment was epigastric pain, and Stewart was referred for more testing. (R. 209). An x-ray of Stewart's thoracic spine on that date showed a "mild compression abnormality of a mid thoracic vertebral body, possibly T7, with depression of the superior and inferior endplates. There are no subluxations. Disc spaces appear preserved." (R. 265).

On January 18, 2005, an intravenous pyelogram was performed, with the only finding one related to possible prostate effects on the bladder. (R. 264-65). On January 31, 2005, a hepatobiliary scan was performed, and it was normal. (R. 264).

On April 24, 2006, Stewart was seen by Kenneth R. Trinidad, D.O., Board Certified Internal Medicine, apparently at the request of his attorney for a hearing-related workers' compensation evaluation. (R. 285-87). In the history section of Dr. Trinidad's report, he stated that Stewart was off work for a back-related work injury, and that Stewart was taking no medications. (R. 285). Dr. Trinidad evaluated Stewart as having an 8.1 percent biaural hearing impairment from industrial exposure. (R. 287).

On March 13, 2006, Stewart was examined by agency consultant Gary R. Lee, M.D., Board Certified Independent Medical Examiner, Sports Medicine. (R. 269-76). Dr. Lee related the history of Stewart's complaints of pain that wrapped around from his mid-back to his chest. (R. 269). He stated that Stewart was taking no medications at the time of the exam. *Id.* Examination showed normal range of motion for Stewart's cervical and lumbar spine, but

diminished range of motion for the thoracic spine, with tenderness, spasm, and diminished sensation about the T8-9 distribution wrapping around the chest. (R. 270). Range of motion and strength was normal for all of Stewart's extremities. (R. 270-71).

A Physical Residual Functional Capacity Assessment was completed by non-examining agency consultant John H. Durfor, M.D., on March 24, 2006. (R. 277-84). Dr. Durfor found that Stewart had the capacity to perform work at the light exertional level. (R. 278). In the section for narrative explanation, Dr. Durfor cited the July 2004 MRI showing minor changes and the January 2005 x-ray showing mild abnormality of the thoracic spine. *Id.* He noted the diminished thoracic range of motion and tenderness found during Dr. Lee's examination, but also noted that Stewart had a normal gait and no neurological deficits. *Id.* He noted that Stewart took no medication, and he listed Stewart's activities of daily living as including showers, simple meals, limited shopping trips, and limited driving. *Id.* He found that Stewart's pain did not limit him beyond the exertional limitation of light work. *Id.* For non-exertional limitations, Dr. Durfor found that Stewart had postural limitations in that he could only occasionally climb, balance, stoop, kneel, crouch, or crawl. (R. 279). He found no other limitations. (R. 280-84).

**Procedural History**

On November 28, 2005, Stewart filed an application for disability insurance benefits under Title II, 42 U.S.C. § 401 *et seq.* (R. 79-84). In this application, Stewart alleged disability beginning May 1, 2004. *Id.* Stewart's application for benefits was denied in its entirety initially and on reconsideration. (R. 49-52, 54-56). A hearing before ALJ Charles Headrick was held November 20, 2007, in Tulsa, Oklahoma. (R. 18-44). By decision dated January 17, 2008, the ALJ found that Stewart was not disabled at any time through the date of the decision. (R. 10-17). On October 9, 2008, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus,

the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[2] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

---

[2] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Stewart met insured status through December 31, 2010. (R. 12). At Step One, the ALJ found that Stewart had not engaged in any substantial gainful activity since his alleged onset date of May 1, 2004. *Id.* At Step Two, the ALJ found that Stewart had a severe impairment of degenerative disc disease. *Id.* At Step Three, the ALJ found that Stewart's impairments did not meet any Listing. *Id.*

The ALJ determined that Stewart had the RFC to do light work, with limitations to occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel, crouch, and crawl. *Id.* At Step Four, the ALJ found that Stewart could not return to past work. (R. 16). At Step Five, the ALJ found that there were jobs that a person with Stewart's RFC could perform. (R. 16). Therefore, the ALJ found that Stewart was not disabled at any time through the date of his decision. (R. 17).

**Review**

Stewart raises four issues on appeal.[3] First, Stewart asserts error at Step Two in the ALJ's failure to acknowledge all of Stewart's conditions as severe impairments. Second, Stewart complains of the ALJ's treatment of the medical opinion evidence.[4] Third, Stewart complains that the ALJ applied the Grids[5] at Step Five. Fourth, Stewart asserts that the ALJ's credibility determination was not in keeping with legal requirements. The undersigned has carefully considered Stewart's arguments and reviewed the ALJ's decision and the evidence. The Court finds no reversible error on the part of the ALJ, and therefore the decision of the ALJ is affirmed.

**Step Two**

Stewart complains that the ALJ should have found that Stewart's hearing loss and his arm and elbow pain were severe impairments at Step Two. It is well settled law in this circuit that any error at Step Two is harmless so long as the ALJ finds at least one condition to be severe, so that the five-step sequential evaluation continues. *Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) (no error in ALJ's failure to include claimant's reflex sympathetic dystrophy as severe impairment at Step Two); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (any error at Step Two was harmless when ALJ properly proceeded to next step of evaluation

---

[3] Plaintiff's Brief did not comply with the Scheduling Order entered in this case on January 13, 2009. (Dkt. #9). The Scheduling Order gave specific requirements for the briefs of the parties, and it stated that briefs should not exceed ten pages. Plaintiff's Brief is seventeen pages long, and there is no record of an application requesting permission to file a brief in excess of ten pages. Counsel for Plaintiff is admonished to request and to obtain permission in the future before filing a brief that does not comply with the orders of this Court.

[4] Stewart states his second asserted error as an error in the ALJ's formulation of his RFC, but the only error complained of is the way that the ALJ reviewed and considered the opinion evidence.

[5] The Grids are the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2.

sequence). Therefore, because the ALJ found one severe impairment at Step Two, there was no reversible error at this step.

**The ALJ's Consideration of the Medical Opinion Evidence**

Stewart raises several issues regarding the ALJ's treatment of opinion evidence. First, he complains that the ALJ did not "include any discussion of reasons for disregarding Dr. McClintock's evaluation regarding the fact that [Stewart] was unable to return to work," referring to a statement in August 5, 2004 treatment notes. Plaintiff's Opening Brief, Dkt. #17, p. 9. The statement referred to is one line in the computerized records of Dr. McClintock, stating "meanwhile can't work due to worsening of [symptoms] with activity, pain is severe." (R. 217).

While Stewart does not cite to it, Dr. McClintock also filled out a CNA form stating that Stewart could not work from May 19, 2004 to July 6, 2004, due to an inability to sit for extended amounts of time because of his pain. (R. 163). This is the only true treating physician opinion, because it is the only opinion that contains functional limitations. *See Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008). The Tenth Circuit in *Cowan* explained that a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." *Id.* at 1189. Thus, the court found that a statement by the treating physician that the claimant had a stroke "and I feel he may never return to work" was not a true medical opinion. *Id. See also Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (unpublished) (ALJ did not need to provide specific legitimate reasons for rejecting portion of treating physicians letter that contained only generalized statements); *Mann v. Astrue*, 284 Fed. Appx. 567, 570 (10th Cir. 2008) (unpublished) (treating physician recommendation that the claimant see an orthopedic specialist was not a treating physician opinion because it did not

address functional limitations).

The nature of the CNA form that Dr. McClintock filled out makes clear that it was given in the context of short-term disability, because it explicitly stated that it was an opinion for the time period from May 19, 2004, to the date of the form, which was July 6, 2004. (R. 163). Given the short-term disability context of the opinion given by Dr. McClintock on the CNA form, this was not a treating physician opinion[6] that the ALJ was required to give controlling weight.

The language cited by Stewart also does not rise to the level of constituting a treating physician opinion. The one line that while Stewart was waiting for an injection by Dr. Revelis he could not work due to worsening symptoms and severe pain is buried in the middle of one examination by Dr. McClintock. It is unclear if she is saying that this is her medical opinion, or if she is stating that Stewart did not believe that he could work, due to pain. *See Cowan*, 552 F.3d at 1189 (brief statement on form was not clear in its meaning).

In any case, the Commissioner is correct in his reasoning that the ALJ was not required to

---

[6]   *See Hamlin*, 365 F.3d at 1215 (treating opinion to be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record). *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted). Because the CNA form and the other records of Dr. McClintock do not rise to the level of a treating physician opinion, within the meaning of the Social Security laws and regulations, the ALJ did not have to follow these additional requirements for considering such an opinion.

13

consider the opinion because at most it was a rescinded work restriction. In *Wall v. Astrue*, 561 F.3d 1048, 1065-66 (10th Cir. 2009), the Tenth Circuit reviewed the historical physician-imposed work restrictions that had been placed on the claimant, but stated that it was uncontroverted that those restrictions had been lifted. The Tenth Circuit therefore held that there were no active physician-imposed restrictions for the ALJ to consider and stated that ignoring rescinded work restrictions could not be reversible error. *Id.* In the present case, the ALJ found that Dr. McClintock had released Stewart back to work.[7] Therefore, even if the doctor's previous statements had risen to the level of a treating physician opinion, that opinion was rescinded and did not need to be discussed in keeping with the requirement that all uncontroverted medical evidence be discussed.

Next, Stewart complains that the ALJ "failed to fully consider" the report of the examining consultant, Dr. Lee. (Plaintiff's Opening Brief, Dkt. #17, p. 10). Again, while Stewart attempts to characterize Dr. Lee's evidence as an "opinion" by a consultative examiner, his complaint is that the ALJ did not consider those portions of Dr. Lee's report in which he

---

[7]   The ALJ states it as a fact that Dr. McClintock released Stewart to return to work, but the page of the record he cites only has an internal communication within Dr. McClintock's office on January 3, 2005. (R. 14-15, 210). The computerized record is not completely clear, but appears to state that the insurance representative told Dr. McClintock that Dr. Revelis "sent [Stewart] back to work." (R. 210). Dr. McClintock then appears to state: "So, if that's what [Revelis] thinks, [let's] send [Stewart] back." *Id.* The assistant then appears to reply that the insurance representative needed something in writing, and then she states that she faxed the letter. The record before this Court does not appear to include a copy of any statement from Dr. Revelis that he released Stewart back to work, or of the letter faxed by Dr. McClintock's office to the insurance representative. While this Court would prefer to have the actual communication from Dr. McClintock to the insurance carrier, instead of just an internal communication making reference to this, the various references made in the record by Dr. McClintock do make clear that any opinions the doctor gave were ones given in the context of short-term disability. As was the case in *Wall,* in the present case there was no *active* physician-imposed restriction on Stewart, and therefore the ALJ did not omit a required discussion of treating physician opinion evidence. *Wall*, 561 F.3d at 1065-66.

14

states that Stewart had back pain with numbness that wrapped around the T8-9 nerve root distribution. (R. 270-71). The evidence of Dr. Lee is medical evidence, but it does not rise to the level of being opinion evidence, because it does not reflect Dr. Lee's opinions on functional limitations of Stewart. *Cowan,* 552 F.3d at 1189 ("[T]rue medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform.") Notwithstanding Stewart's complaints to the contrary, the ALJ did fairly summarize Dr. Lee's report, twice mentioning the portions relating to Stewart's thoracic spine that Stewart complains were not considered. (R. 15).

There was no error in the way that the ALJ discussed or considered the evidence of Dr. McClintock or Dr. Lee.

**Step Five**

Stewart states that the ALJ erred by using the Grids at Step Five. Plaintiff's Opening Brief, Dkt. #17, p. 12. Stewart is correct that, given the nonexertional limitations found by the ALJ, it would have been erroneous to use the Grids. The Grids may not be applied conclusively if claimant has a nonexertional limitation that "significantly limit[s] his ability to perform the full range of work in a particular RFC category on a sustained basis." *Williams*, 844 F.2d at 752 (quotations omitted). In such case, the ALJ may use the Grids as a framework, but must also take the claimant's nonexertional limitations into account when determining if there are a significant number of jobs in the national economy that claimant can perform on a regular basis. *Id.* The testimony of a vocational expert is required to establish that significant jobs exist for the reduced range of light work resulting from the nonexertional limitations. *See Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993).

15

Here, the ALJ did exactly what was required of him, given his determination that Stewart had nonexertional limitations in his ability to only occasionally climb, crawl, etc. He did not use the Grids, but instead he relied on the testimony of the vocational expert that Stewart was able to perform jobs that exist in significant numbers. (R. 16, 41-42). Stewart's argument that the ALJ erroneously used the Grids at Step Five is not supported by the record.

**Credibility Determination**

Stewart raises several complaints regarding the ALJ's credibility analysis, but the undersigned concludes that the ALJ's discussion and analysis in his decision were adequate. Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White,* 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

The ALJ gave several specific reasons for his finding that Stewart lacked credibility. He noted that Stewart last saw his treating physician in 2005. (R. 13-14). The ALJ also stated that Stewart's statements were not totally credible in light of "the degree of medical treatment required." (R. 15). The frequency of seeking medical treatment is a legitimate point in a credibility analysis. *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000).

Second, the ALJ noted Stewart's testimony that he was in pain all the time, but that he took no medication. (R. 14). The level of medication taken for pain is one legitimate factor for

an ALJ to consider in assessing credibility. *Branum v. Barnhart*, 385 F.3d 1268, 1273-74 (10th Cir. 2004) (it was legitimate for the ALJ to note that the claimant did not take prescription pain medication). Here, Stewart's failure to take any medication undercuts his claim that his pain is disabling.

Stewart makes an argument that these first two factors considered by the ALJ in making his credibility determination are not legitimate due to Stewart's testimony that he could not afford treatment. (R. 26-27). Stewart's actual testimony, while not completely clear, appears to relate solely to treatment by Dr. Revelis, the pain specialist. *Id.* Also, Stewart later testified that he had seen Dr. McClintock approximately three months before the hearing. (R. 29-30). There is no direct testimony by Stewart that his failure to take prescription medication was due to his inability to afford it. While it would have been preferable for the ALJ to discuss Stewart's claim that his lack of medical treatment was due to his inability to afford it, the undersigned does not believe that Stewart's testimony in this regard is strong enough to have significantly weakened the ALJ's reasoning on these two points in his credibility assessment.[8]

The ALJ noted that the medical evidence showed that Stewart had been released to return to work by his doctors. (R. 16). This evidence is a legitimate factor for the ALJ to consider, and it substantially weakens Stewart's claims that he is unable to work.

The ALJ noted that Stewart's testimony was not compelling regarding some other conditions, such as his hearing loss, pain he had in his arm and elbow, and symptoms of diabetes. (R. 12, 14-15). The ALJ reviewed Stewart's testimony regarding his activities of daily living,

---

[8]   *Compare Madron v. Astrue*, 311 Fed. Appx. 170, 178 (10th Cir. 2009) (unpublished), in which the ALJ erroneously used the claimant's failure to obtain an MRI as one factor weighing against her credibility, even though the record made references to the claimant's lack of insurance and inability to pay for this procedure.

noting that he could do some household chores, such as light laundry or shopping. (R. 14). The ALJ found Stewart's statements regarding his inability to work not totally credible in light of this testimony. (R. 15).

The undersigned is sympathetic to Stewart's complaint regarding "boilerplate" sentences that are not linked to any evidence. However, the inclusion of inapplicable language in the decision does not mean that the ALJ's credibility analysis is fatally flawed. The Tenth Circuit has come to similar conclusions, stating in one case that it had "some concerns" with the ALJ's reliance on the claimant's failure to follow a weight loss plan and the claimant's performance of minimal household chores. *Branum*, 385 F.3d at 1274. In spite of those concerns, the Tenth Circuit nevertheless affirmed the credibility finding because of other, legitimate factors cited by the ALJ. *Id. See also Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007) (while ALJ's statement of "large variations" in tests was incorrect, there was still substantial evidence supporting his finding of tests' invalidity); *Mann*, 284 Fed. Appx. at 571 (finding credibility determination adequate when ALJ discussed three points). The ALJ's credibility determination was supported by substantial evidence and was in compliance with the legal requirements.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 24th day of February, 2010.

_____
Paul J. Cleary
United States Magistrate Judge